1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

9
10
11
12
13

DONALD DIEHL; DEANNE
CONSOLE; KENNETH P. DUBS,
SR.; DAN FENN; KAREN
McELLIOTT; MARK E. ROEHR;
JACK ROWE; LONNIE C.
TALBERT; FRANK VIRGADAMO;
LARRY L. WESTFALL; and EILEEN
WESTFALL,

14

                    Plaintiffs,

15     v.

16
17
18

STARBUCKS CORPORATION d/b/a
STARBUCKS COFFEE COMPANY,
and d/b/a STARBUCKS
MANUFACTURING COMPANY, a
Washington corporation; and DOES
1-50, inclusive,

19

                    Defendants.

Case No. 12CV2432 AJB (BGS)

ORDER GRANTING IN PART AND
DENYING IN PART
DEFENDANT'S MOTION TO
DISMISS THE FAC

[Doc. No. 14]

20
21
22     Before the Court is Defendant Starbucks Corporation's (*hereinafter* Defendant or

23 "Starbucks") motion to dismiss Plaintiffs's First Amended Complaint ("FAC"). (Doc.

24 No. 14.)  Plaintiffs filed an opposition on December 16, 2013. (Doc. No. 16.)  Defendant

25 replied on December 23, 2013.  The Court entertained oral arguments on January 23,

26 2014 and took the matter under submission.  Upon consideration of the motion and the

27 parties' arguments in support and opposition, the Court GRANTS in part and DENIES in

28 part the motion to dismiss.

# I.   BACKGROUND [1]

Plaintiffs are former shareholders of Mellace Family Brands, Inc. ("MFB") (Doc. No. 13 at 2.)  Incorporated in 2001, MFB mainly produced oil roasted almonds, cashews, and fruit and nut combinations that were then sold in local shopping centers. (*Id.* at 4.) In 2007, Starbucks approached MFB for a potential deal to begin selling MFB products in Starbucks' stores. (*Id.*)  Before entering into a business relationship with MFB, Starbucks performed due diligence and reviewed all of MFB's contracts and obligations with other retailers.  Starbucks was also permitted to review MFB's books and records at all times. (*Id.* at 5.)  The parties began their business relationship in late 2007 and early 2008. (*Id.*)

The general course of the parties' conduct is as follows: (1) Starbucks would provide MFB with volume projections so that MFB could determine the quantity of raw product and packaging materials needed for production of specific products; (2) Starbucks would then send MFB Blanket Purchase Agreements (BPA's) formalizing the scope of orders based upon annual projections provided; (3) MFB would begin purchasing raw materials and packaging materials; (4) MFB would confirm to Starbucks the availability of product to satisfy the BPA; (5) Starbucks then confirms the amount/size of the order and shipment of products to Starbucks' facilities through a BPA Release; (6) after the issuance of the BPA Release, MFB would ship the specified amount of product reflected on the BPA Release; and (7) Starbucks would pay MFB the amount(s) reflected on the BPA Release. (*Id.* at 5-6.)

Plaintiffs allege that although each BPA contained language that disclaims a legal obligation arising from a contract and does not authorize the purchase of inventory, MFB acted in reliance on the amount of products sought by Starbucks in volume projections and the amount of prepared products requested through verbal agreements, "usually confirmed by the BPAs." (*Id.* at 6.)  Plaintiffs allege that in reliance on the relationship with Starbucks, MFB had to upgrade machinery, hire new staff, and increase orders for

---

[1] The following factual allegations are taken from Plaintiff's FAC.

12cv2432

1    raw products and packaging, all of which Starbucks had intimate knowledge of. (*Id.* at

2    7.)  MFB received its first BPA from Starbucks on or about December 5, 2007 and

3    delivered its first shipment to Starbucks in March 2008 "pursuant to the terms outlined in

4    Starbucks volume projections, BPAs, and BPA Releases." (*Id.*)

5        In March 2008, Starbucks provided volume projections to MFB forecasting sales

6    for product orders through September 2008.  In September 2008, Starbucks provided

7    additional volume projection for the months of January through March 2009.  (*Id.* at 8).

8    In September of 2008, Starbucks informed MFB that it had received complaints about

9    the quality of MFBs products. (*Id.*)  Upon investigation, MFB discovered the reason for

10   the defect and reimbursed Starbucks for the costs related to the product's withdrawal.

11   (*Id.*)  In June of 2009, Starbucks received further complaints regarding some MFB

12   products and initiated a product withdrawal.  In August 2009, Starbucks representatives

13   toured MFB facilities and discussions led to an agreement to work with Starbucks

14   representatives to ensure product quality.  In September 2009, Starbucks Product

15   Manager Lori Harris informed MFB that the business was being put out to bid. (*Id.* at 9)

16   MFB reprocessed the bid forms and was awarded business in November 2009.  In

17   awarding MFB the business, Starbucks and Ms. Harris imposed certain other conditions

18   upon MFB through an "Action Plan" dated December 9, 2009, including further product

19   specifications, increased quality reporting to Starbucks, additional investment in

20   equipment for internal testing, and upgrading machinery used for product packaging.

21   (*Id.* at 9-10.)  Plaintiffs allege that MFB complied with conditions imposed at significant

22   costs. (*Id.* at 10.)

23        In January 2010, MFB informed Starbucks Retail Lobby Jane Wong and represen-

24   tative Destiny Linayao that it was having difficulty maintaining current price levels due

25   to a rise in commodity prices. (*Id.*)  They instructed MFB to forward an updated pricing

26   analysis.  Plaintiffs allege that Starbucks then began a business relationship with Sahale

27   Snacks and provided Sahale Snacks MFB's confidential pricing information in an effort

28   to surreptitiously remove MFB from future business with Starbucks.  (*Id.*)

12cv2432

On March 30, 2010, Ms. Wong provided MFB with a volume estimate and "made MFB an offer: that Starbucks would provide purchase orders through October 2010 exceeding $3.1 million in product if MFB would provide a price decrease for product order." (*Id.* at 10-11.)  Plaintiffs alleged that MFB accepted and decreased the unit price. Plaintiffs refer to this as the "3.1 Million Dollar Contract."  (*Id.* at 11.)  Starbucks then issued a BPA for $1,839,656.46, on April 2, 2010, for the months of June through August of 2010. (*Id.*)  On April 6, 2010, Ms. Wong notified MFB that Starbucks released the April 2, 2010 BPA, which Plaintiffs allege constitutes partial performance on the $3.1 Million Contract. (*Id.*)  Plaintiffs allege that in reliance on this Release and oral representations made by Ms. Wong, MFB entered into a contract to purchase approximately $1,000,000 in cashews to fulfill those orders and that Starbucks knew MFB would do so to fulfill Starbucks' order. (*Id.* at 11-12.)

In March and April of 2010, Starbucks informed MFB that it had received complaints regarding MFB's cashew products. (*Id.* at 8.)  Plaintiffs allege that Starbucks conducted a conference call with the Food and Drug Administration ("FDA") which MFB was denied participation in and denied any information afterwards. (*Id.* at 12.) Later in April 2010, Ms. Wong informed MFB that MFB products were "consistently rising and doing well," and that there were no further customer complaints. (*Id.*) However, on April 23, 2010, MFB was notified of a second complaint. (*Id.*)  Starbucks did not provide details to MFB, but retained samples of the product were tested with no defects found by MFB. (*Id.*)  MFB forwarded the results of its internal testing to Starbucks to demonstrate that all retained products met the requirements of the Action Plan instituted by Starbucks in 2009. (*Id.* at 13.)

On May 14, 2010 MFB received a termination letter from Starbucks indicating that no new orders would be issued due to product quality concerns. (*Id.*)  On May 17, 2010 Starbucks informed MFB that neither current BPA Releases nor past BPA Releases would be honored. (*Id.*)  Plaintiffs allege Starbucks representative Destiny Linayao informed MFB that the cost of film and packaging would be reimbursed to MFB,

12cv2432

1   however Starbucks never did so and MFB was left with over $37,000 of unusable
2   Starbucks film and packaging materials. (*Id.*)  On May 24, 2010, MFB received an
3   investment and merger proposal from R.C. Frontis Partners, which was soon withdrawn
4   after the firm learned of MFB's financial hardship that allegedly resulted from
5   Starbucks' conduct. (*Id.* at 14.)

6         On May 25, 2010 an independent laboratory testing of retained samples found all
7   samples to be within the acceptable range of quality specification as provided by the
8   Action Plan.  On May 28, 2010, despite having just terminated the business relationship,
9   Starbucks informed MFB that it would still accept all almond orders for the open
10  purchase orders. (*Id.*)  Plaintiffs allege that MFB shipped the almonds at Starbucks'
11  request as partial performance of the $3.1 Million Dollar Contract. (*Id.*)  Plaintiffs allege
12  that on June 1, 2010, Starbucks informed MFB that all outstanding payments to MFB
13  were on hold from Starbucks' legal department, which included payment for the open
14  purchase orders of almonds Starbucks had just requested. (*Id.*)

15        On June 4, 2010, Starbucks informed MFB that its products were being withdrawn
16  due to FDA concerns. (*Id.* at 9.)  MFB requested return of their product to mitigate
17  damages, but under condition that it was not admitting to liability. (*Id.*)  On June 11,
18  2010, Starbucks and MFB executed an agreement to return products.  The return was
19  completed on or about June 19, 2010. (*Id.* at 15.)  Plaintiffs allege that the FDA investi-
20  gation revealed that certain MFB products had been tainted by a gas leak at a Starbucks
21  facility, through no fault of MFB. (*Id.*)

22        Plaintiffs allege that because of the Defendant's actions, MFB suffered extreme
23  financial difficulty and was forced into insolvency. (*Id.*)  MFB was unable to fulfill
24  contractual obligations with other wholesalers and lost its venture capital commitments.
25  (*Id.*)  After MFB's insolvency, their rights and assets were assigned to Insolvency
26  Services Group ("ISG") for the benefit of their creditors. (*Id.* at 2.)  Plaintiffs, the former
27  shareholders, then purchased "certain assets" from ISG. (*Id.* at 15.)  Plaintiffs allege that
28  each of them lost the entire value of their respective investments in MFB. (*Id.*)

12cv2432

1    Plaintiffs initiated this action in San Diego County Superior Court of California on

2    September 6, 2012.  On October 9, 2012, Defendant filed a notice of removal pursuant to

3    28 U.S.C. § 1441(B), asserting diversity jurisdiction under 28 U.S.C. § 1332. (Doc. No.

4    1.)  On October 16, 2012, the Defendant filed a Motion to Dismiss (Doc. No. 4), arguing

5    that Plaintiffs have failed to state a claim upon which relief may be granted.  That motion

6    was granted by this Court after finding that, though Plaintiffs had standing to bring the

7    action, they could not state a claim for breach of contract based on the BPA which

8    expressly disclaimed any intent to be bound. (Doc. No. 12 at 7-9.)  The Court granted

9    Plaintiffs leave to amend and they did so, filing a timely FAC on November 15, 2013.

10   (Doc. No. 13.)  Plaintiffs' FAC brings five causes of action: (1) breach of contract; (2)

11   negligent misrepresentation; (3) intentional misrepresentation; (4) intentional interfer-

12   ence with prospective economic advantage; and (5) unfair business practice under

13   Business and Professions Code § 17200.  (*Id.*)  Defendant again seeks to dismiss the

14   complaint, arguing Plaintiffs have failed to cure the deficiencies noted within the Court's

15   previous dismissal order and have not alleged a valid contract existed. (Doc. No. 14)

16   **II.   LEGAL STANDARDS**

17       A complaint must contain "a short and plain statement of the claim showing that

18   the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  A motion to dismiss pursuant to

19   Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the

20   claims asserted in the complaint. Fed. R. Civ. P. 12(b)(6); *Navarro v. Block*, 250 F.3d

21   729, 731 (9th Cir. 2001).  The court must accept all factual allegations pled in the

22   complaint as true, and must construe them and draw all reasonable inferences from them

23   in favor of the nonmoving party. *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337–38

24   (9th Cir.1996).  To avoid a Rule 12(b)(6) dismissal, a complaint need not contain

25   detailed factual allegations, rather, it must plead "enough facts to state a claim to relief

26   that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A

27   claim has "facial plausibility when the plaintiff pleads factual content that allows the

28

12cv2432

1   court to draw the reasonable inference that the defendant is liable for the misconduct
2   alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (citing *Twombly*, 550 U.S. at 556).

3       Under Federal Rule of Civil Procedure 9(b), allegations of fraud must be pled with
4   particularity. *See* Fed. R. Civ. P. 9(b).  Rule 9(b) requires that, when fraud is alleged, "a
5   party must state with particularity the circumstances constituting fraud. . ." *Id*.  Any
6   averments which do not meet that standard should be "disregarded," or "stripped" from
7   the claim for failure to satisfy Rule 9(b). *Id*.  "Averments of fraud must be accompanied
8   by 'the who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba-*
9   *Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137
10  F.3d 616, 627 (9th Cir.1997)).

11      Dismissal under Rule 12(b)(6) is proper only when a complaint exhibits either a
12  "lack of cognizable legal theory or the absence of sufficient facts alleged under a
13  cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.
14  1988).  "A complaint should not be dismissed 'unless it appears beyond doubt that the
15  plaintiff can prove no set of facts in support of his claim which would entitle him to
16  relief.'" *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 248 (9th Cir. 1997) (quoting
17  *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99 (1957)).

## III.   DISCUSSION

### A.   Breach of Contract

20      In California, to establish a claim for breach of contract, a plaintiff must show: (1)
21  a contract existed; (2) plaintiff performed his duties or was excused from performing his
22  duties under the contract; (3) the defendant breached the contract; and (4) the plaintiff
23  suffered damages as a result of that breach. *See First Commercial Mortgage Co. v.*
24  *Reece*, 89 Cal. App. 4th 731, 745 (2001).  An essential element of a contract is the
25  consent of the parties, or mutual assent; in other words there must be a meeting of the
26  minds.  Cal. Civ. Code § 1550(2); *see also Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th
27  199, 209 (2006).

28

12cv2432

Plaintiffs allege that Starbucks breached three separate contracts. (*Id.* at 17-18.) First, a March 17, 2010 BPA Release issued by Starbucks for a purchase price of $585,772.56 entered into based upon "negotiations and agreements between the parties." Likewise, a second March 26, 2010 Release for a purchase price of $293,898.72. Third, the $3.1 Million Dollar Contract entered into on or about March 30, 2010. (*Id.*) Plaintiffs allege that Starbucks breached the two March Releases by "accepting the products shipped by MFB pursuant to the BPA releases and thereafter withholding payment for the product received," and breached the $3.1 Million Dollar Contract (after partially performing by releasing the April 2, 2010 BPA) by "terminating the contract after MFB accepted the offer and took action in reliance on the agreement." (*Id.* at 17.)

1.   The $3.1 Million Dollar Contract

Defendant argues that Plaintiffs' claim fails as a matter of law as they have failed to establish the existence of a valid contract. (*Id.*) Defendant contends that the March 2010 volume projection email from Ms. Wong is not a valid contract nor is the April 2, 2010 BPA. Specifically, the March 2010 email was merely the start of preliminary negotiations therefore no legal obligation between the two parties arose. (*Id.* at 7.) Moreover, the subsequent April 2, 2010 BPA cannot form the basis of a contract as the express language contained therein states "[a]ny listed QUANTITY is non-binding and is included for the sole purpose of establishing a limitation on Releases to this BPA during the Effective period." (*Id.* at 9.) Thus, disclaiming any intent to bind the parties. (*Id.*)

In its previous order, the Court dismissed Plaintiffs' breach of contract claim for failing to allege a valid contract showing mutual assent. (Doc. No. 12.) The Court noted that asserting the BPA as a valid contract failed, as the express language therein gave MFB "reason to know that the person making it did not intend to conclude a bargain until he has made a further manifestation of assent." (*Id.* at 9.) Specifically, that further manifestation of assent would come in the form of the BPA Release or a separate purchase order. For the $3.1 Million Dollar Contract, that release never materialized and

therefore the Court could not conclude that the parties intended to be bound.  Although Plaintiffs do not allege they received the actual Release, Plaintiffs have pled additional facts to support their contention that a legal obligation existed.

Specifically, Plaintiffs allege that prior to the issuance of the April 2, 2010 BPA, the parties entered into a new negotiation on the terms of their business relationship. Plaintiffs allege that Starbucks, represented by Ms. Wong, made an oral offer to provide MFB with purchase orders through October of 2010 if MFB would in turn provide a price decrease for products ordered. (Doc. No. 13 at 10-11.)  According to Plaintiffs, Ms. Wong supported her offer with a copy of the volume projection. (*Id.* at Ex. A.)  MFB accepted the offer and decreased the price of their products. (*Id.* at 11.)  Thereafter, Ms. Wong made a verbal representation that a Release had been issued for the April 2, 2010 BPA.

Defendant contends, and the Court does note, that the sequence of events Plaintiffs have alleged for the $3.1 Million Dollar Contract digresses from the normal course of dealings Plaintiffs first established.  However, Plaintiffs allege, and the Court can conceive, that this alternative transaction occurred because the parties renegotiated the product price.  In addition, Plaintiffs allege Ms. Wong made false representations to MFB regarding the release of the April 2, 2010 BPA.  Thus, as this is a motion to dismiss and the Court must take all factual allegations as true and make all reasonable inferences in favor of Plaintiff, the Court cannot definitely state that a valid contract supported by mutual assent did not exist.

The existence of mutual assent is determined by objective criteria, not by one party's subjective intent.  The reasonable person test governs, in other words, whether a reasonable person would conclude there was mutual agreement by looking at the parties' conduct.  *Marin Storage & Trucking, Inc. v. Benco Contracting and Eng'g, Inc.*, 89 Cal. App. 4th 1042, 1051 (Cal. Ct. App. 2001) (internal citations omitted).  Here the verbal agreement as alleged was that Starbucks would provide for purchase orders through October 2010 if MFB provided a price decrease.  The parties conduct as alleged, appear

12cv2432

1    to support the inference that a contract was made; MFB did indeed decrease the unit

2    price for their products and Starbucks issued a volume projection and BPA as if confirm-

3    ing that verbal agreement.  Additionally, Plaintiffs allege that despite any disclaimer

4    language contained within the BPA, MFB relied upon the Ms. Wong's "assurances and

5    agreement" in regards to the verbal $3.1 Million Dollar Contract.  (Doc. No. 13 at 11.)

6    Specifically, Plaintiffs contend Ms. Wong made verbal assurances that a release had

7    been issued for the April 2, 2010 BPA.  (*Id.* at 11.)

8         Plaintiffs' theory is a reasonable inference given the facts as alleged.  Although

9    Plaintiffs may have difficulty sustaining and proving this theory, given the express terms

10   of the projection email and BPA, at this early stage, it would be improper for the Court to

11   nonchalantly dismiss Plaintiffs' well pled claim without allowing Plaintiffs the opportu-

12   nity to conduct factual discovery.

13        Finally, Defendant asks this Court to dismiss Plaintiffs' claim as the FAC alleges a

14   breach of contract claim that is "in direct contradiction to the factual allegation in the

15   original complaint, where the April 2010 BPA was the alleged contract at issue."  The

16   Court is unpersuaded by this argument.  First, the Court must examine the pleading that

17   is currently before it - the FAC.  *Loux v. Rhay*, 375 F.2d 55, 57 (9th Cir. 1967).  Second,

18   the Court does not find the FAC to be "factually inconsistent" with the original Com-

19   plaint.  Indeed, the FAC merely contains additional factual allegations that allows

20   Plaintiffs to rely on an alternative theory to establish a breach of contract.  Thus, this is

21   not the situation where two pleadings are irreconcilably at odds with each other.

22        2.    The March 17, 2010 and March 26, 2010 BPA Releases

23        In addition to the $3.1 Million Dollar Contract, Plaintiffs allege that Starbucks

24   breached its contract with MFB by failing to honor the March 17, 2010 and March 26,

25   2010 BPA Releases. (*Id.* at 17.)  Plaintiffs allege that despite accepting the products

26   shipped pursuant to the terms of the Releases, Starbucks withheld payments owed to

27   MFB. (*Id.*)  Defendants argue that any breach of contract claims based upon these

28

12cv2432

Releases must fail as Plaintiffs failed to "allege that any BPA exists with respect to the alleged releases . . . failed to attach any such BPA . . . failed to attach any BPA Releases . . . [and] failed to state verbatim the terms of these releases." (Doc. No. 14 at 11.)  Citing to California state law and an unpublished case from this district, Defendant contends that these failures necessitate dismissal of Plaintiffs' breach of contract claims based upon these March Releases.

Federal law does not require a plaintiff to recite the contract terms verbatim or to attach a copy of the contract to the complaint.  Pleading is governed by Rule 8 of the Federal Rules of Civil procedures, not state procedural requirements.  Under Rule 8(a), a "short and plain statement of the claim" suffices.  Federal Rules of Civil Procedure forms note that a "plaintiff may set forth the contract verbatim in the complaint or plead it, as indicated, by exhibit, or plead it according to its legal effect."  *See* Fed. R. Civ. P Official Form 3, 12; *see also* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedures* § 1235 (2004).

Presently, Plaintiffs have sufficiently pled the "legal effect" of the contract. Plaintiffs have alleged sufficient facts to enable Defendant to understand and respond to the claims.  Plaintiffs alleged that on March 2, 2010, BPAs were "pending." (Doc. No. 13 at 10.)  It is also important to note that in the instant case, the terms of the contract are not confined in a singular document.  Instead, the parties' obligations towards one another and basis of dealings between them are shown through the general course of conduct as alleged by Plaintiffs.  Indeed, the claims based upon the two March Releases conform to the general course of conduct established by Plaintiffs' FAC.  Based upon these alleged facts, the Court can reasonably infer that a BPA did exist and that the March Releases were for the existing BPA.  Plaintiffs further stated that MFB shipped the product in accordance with the terms of the Releases, however Starbucks failed to tender payment, thereby constituting a breach.  Plaintiffs have also stated the total outstanding amount due to MFB for the Releases, $585,7272.56 for the March 17

12cv2432

1   Release and $293,898.72 for the March 26 Release.  Given the factual allegations
2   contained in the FAC, Defendant is sufficiently on notice of Plaintiffs' claims against it.

3          Accordingly, Defendant's motion to dismiss the breach of contract claims is
4   DENIED.

5   **B.     Fraud Claims (Intentional and Negligent Misrepresentation)**

6          Plaintiffs' second and third causes of action allege that Starbucks, through their
7   representative Ms. Wong, made statements to MFB that constitute both negligent and
8   intentional misrepresentation.  Defendant moves to dismiss on two grounds.  First, a
9   valid contract did not exist and thus Plaintiffs' reliance was not justified or reasonable.
10  Second, Plaintiffs did not allege a violation of an independent duty under tort principles
11  as required under California law, thus Plaintiffs attempt to bring another breach of
12  contract claim masked as a fraud claim. (Doc. No. 14 at 12-13.)

13         As to the first ground, the Court has already disposed of the matter by finding that
14  Plaintiffs alleged enough facts to sufficiently plead the existence of a valid contract.
15  Moreover, Plaintiffs have alleged MFB relied upon Starbucks' representations to its
16  detriment.  This reliance is manifested by the factual allegation that MFB entering into
17  agreements to purchase raw materials, as well as shipping and packaging supplies.

18         As to the second ground, Defendant brings forth two arguments.  First, Defendant
19  contends that Plaintiff has impermissibly brought a tort claim predicated on the breach of
20  contract.  Second, Defendant argues Plaintiff failed to establish the intent element of a
21  misrepresentation claim.  California law imposes tort liability only when a breach of
22  contract violates an independent duty arising from principles of tort law. *Applied Equip.*
23  *Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 515 (1994).  The FAC has met this
24  requirement.  Plaintiffs do not plead the breach of contract itself as the tortious conduct,
25  instead the tort claims are based on the alleged misrepresentations and false promise of
26  performance, thereby constituting fraud.  As alleged by the FAC, Plaintiffs have pled a
27  misrepresentation regarding the performance of contractual obligation, knowledge, intent

28

12cv2432

to defraud, justifiable reliance, and resulting damage. *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004).

Additionally, where a fraud or misrepresentation is predicated on a failure to perform contractual obligations, California law requires "something more than nonperformance" to prove the "defendant's intent not to perform his promise." *Tenzer v. Superscope Inc.*, 39 Cal. 3d 18, 30 (Cal. 1985); *see also Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*, 151 Cal. 4th 1169, 1183 (2013) (finding intent must be shown by more than proof of an unkept promise or mere failure to perform).  Fraudulent intent may be established or inferred by circumstantial evidence. *Id.* (citing Prosser and Keeton on Torts 764-765 (5th ed. 1984)).  Here, Plaintiffs allege that Starbucks intended to meet its supply needs through Sahale Snacks and/or other suppliers by negotiating with Sahale Snacks as well as sharing MFB's confidential pricing information with Sahale Shacks. (*See* Doc. No. 13 at 10; 21.)  Allegedly, this was done to "surreptitiously remove MFB from further business with Starbucks . . . [and] Starbucks had no intent to fulfill its $3.1 Million Dollar Contract with MFB . . . " (*Id.* at 21.)  Taking the allegations as true, as this Court must in ruling on a motion to dismiss, Plaintiffs have sufficiently pled facts that would show Starbucks' intent not to perform the contractual obligation thereby making any alleged oral statements to the contrary fraudulent.  The Court thus DENIES the motion to dismiss the fraud based claims.

**C.    Intentional Interference with Prospective Economic Advantage (IIPEA)**

To state a claim for IIPEA, a plaintiff must show (1) an economic relationship between the plaintiff and third person containing the probability of future economic benefit to the plaintiff; (2) knowledge by the defendant of the existence of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) damages to plaintiff proximately caused by the defendant's acts. *Blank v. Kirwan*, 39 Cal.3d 311, 330 (1985).  To satisfy the third element, a "plaintiff must plead and prove the defendant's acts are wrongful apart from

12cv2432

1   the interference itself. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134,

2   1154 (Cal. 2003).

3           Defendants move to dismiss on grounds that Plaintiffs failed to allege how any

4   conduct by Starbucks was independently unlawful under a "constitutional, statutory,

5   regulatory, common law, or other determinable legal standard" as required by *Korea*

6   *Supply. Id.* at 1159.  In *Korea Supply*, the California Supreme Court emphasized the

7   distinction between the two torts of intentional interference with contract and IIPEA. *Id.*

8   at 1157 ("We caution that although we find the intent requirement to be the same . . .

9   these torts remain distinct.").  The California Court explained that the tort of IIPEA is

10  "considerably more inclusive than actions based on contract or interference with con-

11  tract," and it is possible for a plaintiff to state causes of action for both torts. *Id.* (internal

12  citation omitted).  Because of this, courts must be more demanding of a plaintiff

13  attempting to plead IIPEA. *Id.* at 1159.

14          As it stands now, the FAC does not meet the more rigorous pleading requirements

15  mandated by *Korea Supply*.  The FAC alleges that Starbucks was aware of existing

16  business relationships with other retailers, was aware that MFB had to pre-order raw

17  materials to meet its obligation to Starbucks, and was aware that MFB had lucrative

18  prospective business opportunities and offers for private investment. (Doc. No. 13 at 23-

19  24.)  The FAC contends that as a result of Starbucks' breach of contract, MFB was

20  forced to cancel product orders of raw materials, could no longer sustain its business

21  operations, compromised its relationship with other retailers, which ultimately resulted in

22  MFB's insolvency. (*Id.* at 24.)  However, the tort of IIPEA "is not intended to punish

23  individuals or commercial entities for . . . their pursuit of commercial objectives." *Korea*

24  *Supply*, 29 Cal. 4th at 1159. The current FAC seeks to do just this.  Instead, IIPEA can

25  only be brought if a defendant's "interference amounts to independently actionable

26  conduct."  *Id.*  The California Supreme Court has defined this to mean an act that is

27  "proscribed by some constitutional, statutory, regulatory, common law, or other determi-

28  nable legal standard." *Id.* (internal citations omitted).  As Plaintiffs have failed to

1   establish how Starbucks' interference with prospective economic advantage was a wrong

2   independent from the act itself, the Court GRANTS the motion to dismiss with leave to

3   amend.

4   **D.   Unfair Competition Law ("UCL") Claim**

5          California Business and Professions Code § 17200 prohibits unfair competition,

6   defined to include any "unlawful, unfair or fraudulent business act or practice that is

7   unfair, deceptive, untrue or misleading advertising." Cal. Bus. Prof. Code § 17200.  The

8   UCL is "written in the disjunctive, it establishes three varieties of unfair competition -

9   acts or practices which are unlawful, unfair, or fraudulent.  An act can be alleged to

10  violate any or all of the three prongs of the UCL - unlawful, unfair, or fraudulent."

11  *Berryman v. Merit Prop. Mgm't, Inc.*, 152 Cal. App. 4th 1544, 1554 (2007).  The scope

12  of California's UCL is "sweeping, embracing anything that can properly be called a

13  business practice and at the same time is forbidden by law." *Rubin v. Green*, 4 Cal. 4th

14  1187, 1200 (1993).  Plaintiffs allege that the above mentioned conduct on Starbucks'

15  part amounts to an "unfair" business practice.  (Doc. No. 13 at 28.)  In response, Starbuc-

16  ks contends that Plaintiffs have failed to plead how the alleged conduct is unfair under

17  the UCL. (Doc. No. 14 at 15.)   In their reply, Plaintiffs attempt to show they've suffi-

18  ciently alleged a UCL violation predicated on the "unlawful prong." (*See* Doc. No. 17 at

19  16-17.)

20         California courts have continuously expanded upon what constitutes an unfair

21  business act.  *See Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735, 739-40 (1980)

22  (noting it would be impossible to draft in advance detailed legislation of all acts and

23  conduct prohibited, "since unfair or fraudulent business practices may run the gamut of

24  human ingenuity and chicanery.")   The scope of the UCL is broad but not unlimited and

25  courts should not impose their own notions of fairness.  *McCann v. Lucky Money, Inc.*,

26  129 Cal. App. 4th 1382, 1387 (2005).  A business practice is unfair within the meaning

27  of the UCL if it violates established public policy or if it is immoral, unethical, oppres-

28  sive or unscrupulous and causes injury to consumers which outweighs its benefits.

12cv2432

1   *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1474 (2006).  The crux of

2   Starbucks' argument is that Plaintiffs have failed to establish how any alleged conduct

3   falls under these definitions. (Doc. No. 14 at 15.)

4       Plaintiffs' opposition to the motion to dismiss relies upon the "unlawful" prong of

5   the UCL.  The "unlawful" prong borrows from other sources of law.  Under this prong,

6   violations of other laws, whether criminal or civil, federal or state, statutorily or judi-

7   cially created, are separately actionable under the UCL.  *See State Farm Fire & Cas. v.*

8   *Super. Ct.*, 45 Cal. App. 4th 1093, 1103 (1996); *see also Bowland, Inc. v. Rolf C. Hagen*

9   *(USA) Corp.*, 685 F. Supp. 2d 1094, 1110 (E.D. Cal. 2010) ("As to unlawful acts, the

10  UCL 'borrows' violations of other laws.").  Plaintiffs contend in their opposition, that by

11  sharing MFB's information with competitors, Defendant's conduct violates provisions of

12  the Uniform Trade Secrets Act ("UTSA") and the "spirit of anti-trust laws." (Doc. No. 16

13  at 17-18.)

14      Although the FAC contains factual allegations with regards to Starbucks' alleged

15  sharing of confidential pricing information with MFB competitors, it did not attempt to

16  plead the alleged conduct as violations of anti-trust or trade secret laws.  Given the

17  expansive scope of the UCL and the broad array of conduct that falls under this "disjunc-

18  tive" statute, it would be impractical to ask Defendants to just know exactly what

19  Plaintiffs meant to allege.  As such, Defendants would not have sufficient notice of the

20  claim to properly prepare an answer and/or defense.  Accordingly, the Court GRANTS

21  the motion to dismiss with leave to amend.

22 **E.    Punitive Damages**

23      California law authorizes exemplary damages "in an action for the breach of an

24  obligation not arising from contract, where it is proven by clear and convincing evidence

25  that the defendant has been guilty of oppression, fraud, or malice," in addition to actual

26  damages Cal. Civ. Code § 3294.

27      Under their fraud based claim, Plaintiffs seek an award of punitive damages

28  against Starbucks to "deter similar conduct in the future and punish Starbucks for its

conduct." [2]  (Doc. No. 13 at 19-23.)  Defendant brings a Rule 12(b)(6) motion challenging the sufficiency of Plaintiffs' request, arguing that punitive damages are "purely personal," therefore unassignable and unrecoverable by Plaintiffs. (Doc. No. 14 at 16.)

Defendant relies on *Murphy v. Allstate Ins. Co.*, 17 Cal. 3d 937 (1976) to support their contention that Plaintiffs are not entitled to punitive damages based on their standing as assignees.  The *Murphy* decision made clear that a "purely personal" tort cause of action is not assignable in California, and therefore, damage for emotional distress is not assignable either. *Id.* at 942.  The language in *Murphy* at issue is:

> The insured may assign his cause of action for breach of the duty to settle without consent of the insurance carrier . . . However, part of the damage arises from the personal tort aspect of the bad faith cause of action.  And because a purely personal tort cause of action is not assignable in California, it must be concluded that damage for emotional distress is not assignable. *The same is true of a claim for punitive damage.*

*Id.* (emphasis added) (citations omitted).  Defendant would have the Court find that *Murphy* creates a blanket rule that punitive damages may never be assigned.  However, the state of the law is never so black and white or easily adjudicated.  Moreover, the California Supreme Court has never definitely ruled punitive damages may never be assigned no matter what cause of action they are brought under.[3]  Plaintiffs ask this Court to discount several other cases interpreting *Murphy* to stand for the proposition that punitive damages are not assignable, on the basis that these cases do so only in dicta or failed to carefully analyze the context of *Murphy*. (Doc. No. 16 at 19.)  The Court finds an independent analysis appropriate.

---

[2] Plaintiffs also sought punitive damages under their IIPEA claim, however that claim has been dismissed. (Doc. No. 13 at 23-25.)

[3] In *Nelson v. Exxon Mobile Corp.*, 102 Cal. Rptr.3d 311 (2009), Justice Cantil-Sakauye, who now sits as the Chief Justice of the California Supreme Court, concluded that a punitive damages claim incident to a property tort was assignable as it is "not the nature of the relief that prohibits a claim for . . . punitive damages from being assigned."

The California Supreme Court granted review on the issue of the assignability of punitive damages on February 10, 2010. *Nelson*, 225 P.3d 1080.  However, due to the parties settling, review was dismissed on April 27, 2011. *Nelson*, 271 P.3d 1040.  Such a clarification would have been beneficial in the instant case, regrettably it did not come to light.

In California, "assignability of things in action is now the rule; nonassignability, the exception; and this exception is confined to wrongs done to the person, the reputation, or the feelings of the injured party, and to contracts of a purely personal nature . . ." *Wikstrom v. Yolo Fliers Club*, 206 Cal. 461, 464 (1929) (internal quotations and citation omitted). Although the issue before the court is not whether the causes of action themselves were assignable, it is still worthy to note that assignability necessarily relies on the "purely personal nature" of a cause of action, some of which allow the recovery of punitive damages.

In California, every contract holds an implied covenant of good faith and fair dealing requiring the insurer to settle in an appropriate case. *Murphy,* 17 Cal.3d at 940-41. California law recognizes the existence of a tortious breach of this covenant in some circumstances, including insurance. *See e.g.*, *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d 809 (1979) (explaining that the special relationship between the insured and the insurer supports the imposition of tort liability for a breach of the implied covenant of good faith and fair dealing). *Murphy* involved an assignment of a cause of action against an insurer for a breach of the duty to settle. *Murphy*, 17 Cal.3d at 941. When a carrier breaches the duty to settle, the injured insured is allowed to recover, among other damages, emotional distress and punitive damages suffered from the defendant's tortious breach. *Id.* at 942. The *Murphy* Court took note that part of the damages recoverable from a breach of the duty to settle arises from the "*personal tort aspect* of the bad faith cause of action." *Id.* (emphasis added) (citing *Crisci v. Security Ins. Co.*, 66 Cal.2d 425, 433 which discusses the injury of mental and emotional suffering.) Because that tort was purely personal and thus unassignable, the same would be true for the emotional distress and the punitive damages permitted by that tort. *See Schlauch v. Hartford Accident & Indem. Co*, 146 Cal. App. 3d 926, 931 (1983) (finding an insured may assign the breach of contract aspect of the bad faith claim but not the tort aspect). So in actuality, the issue before the *Murphy* Court was the assignability of a particular claim, not the assignabiltiy of a particular remedy. *Murphy* declared punitive damages unassignable because the

12cv2432

1  underlying action was unassignable.  It would then appear that whether punitive damages

2  may be assigned does not rely on the nature of the relief, instead it relies upon the nature

3  of the cause of action it is brought under.

4      This is further supported by the fact that punitive damages is not a cause of action

5  in and out itself, instead it is an incidental relief a plaintiff may recover in some circum-

6  stances.  Under California law, punitive damages are properly awarded to punish

7  wrongdoers and deter others from committing future wrongful acts, thereby making its

8  purpose one that benefits the public at large. *Century Sur. Co. v. Polisso*, 139 Cal.

9  App.4th 922, 947 (2006) (citing *Pacific Mut. Life. Ins. Co. V. Haslip*, 499 U.S. 1, 19, 111

10  S. Ct. 1032 (1991)); *Power Standards Lab, Inc. v. Federal Exp. Corp*, 127 Cal. App. 4th

11  1039, 1047 (2005) ("[T]he purpose of punitive damages is a purely public one. The

12  public's goal is to punish wrongdoing and thereby to protect itself from future miscon-

13  duct, either by the same defendant or other potential wrongdoers.").  Nothing about the

14  relief itself makes it "purely personal" and therefore unassignable.

15      Plaintiffs direct the Court's attention to cases applying California law and

16  interpreting *Murphy* to stand for the proposition that punitive damages are not assign-

17  able. (Doc. No. 16 at 19.)  The Court agrees these cases do not inform the analysis in the

18  instant motion.  In *GATX/Airlog Co. v. Evergreen Intern. Airlines Inc.*, 52 Fed. Appx.

19  940 (2002), the Ninth Circuit affirmed the district court's  decision barring the assignor's

20  claim for punitive damages. *Id.* at 942.  In the unpublished opinion, the Ninth Circuit did

21  not explain its reasoning other than citing to *Smith v. State Farm Mut. Auto. Inc. Co.*, 5

22  Cal. App. 4th 1104 (1992), for the proposition that California law bars assignment of

23  claims for punitive damages.  Like, *Murphy*, *Smith* involved an assignment of a cause of

24  action against the insurer for the breach of the implied covenant of good faith and fair

25  dealing, this time the duty to defend.  *Smith* cites to *Murphy* stating that "courts have

26  barred assignment only of claims for punitive damages or emotional distress." *Id.* at

27  1111.  The Court has already discussed its interpretation of *Murphy* and why it does not

28  stand for a blanket rule that all punitive damages, no matter the cause of action, are

1    unassignable.  *Drazen v. Atlantic Mut. Ins. Co.*, 2010 WL 2629576, at *1 (N.D. Cal.

2    2010) also involved an insurance company's refusal to defend and indemnify.  The

3    District Court refused to grant assignee plaintiffs' request for punitive damages by

4    relying upon *Murphy*. *Id.* at *4.  The Court's interpretation of *Murphy* today would not

5    disturb these cases as the decisions therein, precluding an assignment of punitive

6    damages, relied on the finding that the punitive damages sought by the assignees

7    stemmed from the purely personal tort aspect of the breach of the implied covenant in the

8    insurance policies.  This requisite does not exist in the instant case, as this Court is not

9    dealing with an insurance policy and thus we are not dealing with a "purely personal"

10   tortious breach.

11          In the instant case, punitive damages are sought under the fraud causes of action.

12   Due to the alleged fraud, MFB, the business entity, was harmed as it had to expend

13   money to purchase raw materials and other items to meet its obligation under the alleged

14   $3.1 Million Dollar Contract.  In this respect, MFB's property interest was harmed as its

15   assets were diminished.  The Court finds the instant case more comparable to *Nelson v.*

16   *Exxon Mobil Corp.*, 179 Cal. App. 4th 633, 102 Cal. Rptr. 3d 311 (2009) than *Murphy*.

17   Although the case was superseded, Justice Cantil-Sakauye's reasoning is nevertheless

18   persuasive.[4]  *Nelson* involved an injury to property, rather than personal injury, the

19   property at issue was held in a trust, the entirety of the trust asset was subsequently

20   transferred to a corporation.  The issue before the court was whether the corporation had

21   a claim to punitive damages.  The Court of Appeal declared that "the assignment of the

22   punitive damages claim is incident to the transfer of real property" and therefore punitive

23   damages could be assigned under the given circumstances.  *Nelson*, 102 Cal. Rptr. 3d at

24   319-23.  The *Nelson* Court reasoned that it is the nature of the of the cause of action that

25

26   ────────────

27          [4] Ultimately, the appeal was dismissed due to the parties settling the matter.

28          The Court's interpretation of *Murphy* today is consistent with that of Justice
     Cantil-Sakauye's. *See Nelson*, 102 Cal. Rptr. 3d at 317-19.

12cv2432

1    determines whether the punitive damages permitted by it are assignable or not.  There-

2    fore, the corporation had a valid claim for punitive damages.

3          Furthermore, in *Nelson,* title to the real property was held in a trust on behalf of

4    the trust beneficiaries, those same trust beneficiaries became the shareholders of the

5    corporate assignee.  Therefore "the identity of the parties allegedly injured by [defen-

6    dant's] actions remained the same. *Id.* at 322.  In the instant case, although not dispositi-

7    ve to the instant issue, Plaintiffs were former shareholders of MFB who now bring the

8    claims in their individual capacity.  The damage alleged in the instant case was damage

9    to the corporation, an entity that exists for the benefit of its shareholders.  Thus, similarly

10   the identity of the parties allegedly injured by Starbucks' conduct remains the same.

11         It is also worthy to take note of how other states address the issue.  The *Nelson*

12   court examined two, Illinois and Indiana.  *See Nelson*, 102 Cal. Rptr. 3d at 321-23.  In

13   *Federal Deposit Insurance Corp. v. W.R. Grace & Co.*, 691 F. Supp. 87 (N.D. Ill. 1988),

14   the court reasoned that punitive damages are a type of relief "which is part and parcel of

15   the underlying cause of action and do not constitute an independent basis of recovery."

16   Accordingly, as the fraud cause of action was properly assigned, so too the correspond-

17   ing punitive damages claim. *Id.* at 92.  Similarly, the Illinois Supreme Court has stated

18   "punitive damages are a component of the relief available in an action and are therefore

19   deemed a part of the underlying action." *Kleinwort Benson N. Am. Inc. v. Quantum Fin.*

20   *Serv., Inc.*, 181 Ill. 2d 214, 274 (1998).  *Kleinwort* involved an assignment by one

21   corporation of its interest in a lawsuit, for fraud in connection with the sale of a broker-

22   age firm which included a claim for punitive damages, to two shareholders.  The

23   *Kleinwort* court rejected the argument that the shareholders had no standing to pursue

24   the punitive damages claim. *Id.*  In *Summit Account and Computer Serv., Inc. v. RJH of*

25   *Florida, Inc.*, 690 N.E.2d 723 (Ind. App. 1998), claims for legal malpractice and punitive

26   damages were found to be transferable when the injured corporation sold off its assets,

27   including the claims, to an intermediary corporation which in turn sold the assets to the

28   litigating corporation.  The Indiana appeals court found that there was a direct "continua-

1    tion" of the original corporation, notably because one individual was the sole share-

2    holder for each of the three corporations. *Id.* at 728.

3            Consequently, the Court does not find *Murphy* to establish a blanket rule preclud-

4    ing the assignment of punitive damages in any and all actions.  Defendant's argument on

5    this basis is rejected.  However upon an examination of the FAC, the Court finds that

6    Plaintiffs have failed to adequately plead the requisite elements to warrant an award of

7    punitive damages.  Punitive damages are only permitted where a defendant is guilty of

8    "oppression, fraud, or malice . . ." Cal. Civ. Code § 3294.  Under their Intentional

9    Misrepresentation claim, Plaintiffs state "Starbucks acted with fraud, malice and

10   oppression, justifying an award of punitive damages to Plaintiffs . . ." (Doc. No. 13 at

11   23.)  Merely employing the magic words does not render a claim sufficiently alleged.

12   Plaintiffs' current allegations are conclusory and fail to show Starbucks acted with an

13   intent to cause injury to MFB, acted in a "despicable" manner that subjects a person to

14   cruel or unjust hardship, or acted fraudulently with the intent to injure MFB. *See* Cal.

15   Civ. Code § 3294.  The Court thus GRANTS the motion to dismiss the punitive damages

16   claim with leave to amend.

17   **IV.    CONCLUSION**

18           For the reasons stated above, the Court GRANTS in part and DENIES in part

19   Defendant's Motion to Dismiss.  Plaintiffs' intentional interference with prospective

20   economic advantage, California UCL, and punitive damages claims are DISMISSED

21   with leave to amend.  Plaintiffs shall have thirty (30) days of the entry of this Order to

22   file the Second Amended Complaint.  No new claims or parties may be added without

23   leave of the Court.

24   IT IS SO ORDERED.

25

26   DATED:  January 27, 2014

27                                                    _____

28                                                    Hon. Anthony J. Battaglia
                                                     U.S. District Judge

                                                                                    12cv2432