UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD DIEHL; DEANNA CONSOLE; KENNETH P. DUBS, SR.; DAN FENN; KAREN McELLIOTT; MARK E. ROEHR; JACK ROWE; LONNIE C. TALBERT; FRANK VIRGADAMO; LARRY L. WESTFALL; and EILEEN WESTFALL,<br><br>      Plaintiffs,<br>v.<br><br>STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY, and d/b/a STARBUCKS MANUFACTURING COMPANY, a Washington corporation; and DOES 1-50, inclusive,<br><br>      Defendants. | Case No. 12CV2432 AJB (BGS)<br><br>ORDER GRANTING DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT AS TO PUNITIVE DAMAGES WITHOUT LEAVE TO AMEND<br><br>[Doc. No. 28] |

  Before the Court is the motion to dismiss Plaintiffs' Third Amended Complaint ("TAC"), filed by Defendant Starbucks Corporation ("Defendant" or "Starbucks"). (Doc. No. 28.) Having found the matter appropriately addressed on the papers pursuant to Civil Local Rule 7.1.d.1, the Court did not require appearances and instead deemed the matter submitted. (Doc. No. 32.) Upon consideration of the motion and the parties' arguments in support and opposition, the Court GRANTS the motion to dismiss the request for punitive damages.

## I.  BACKGROUND[1]

Plaintiffs are former shareholders of Mellace Family Brands, Inc. ("MFB"). (TAC 2, Doc. No. 27.) Incorporated in 2001, MFB produced oil roasted almonds, cashews, and fruit and nut mixed combinations that were then sold in local shopping centers. (*Id.* at 4.) In 2007, Starbucks approached MFB for a potential deal to begin selling MFB products at Starbucks stores. (*Id.*) Before entering into a business relationship with MFB, Starbucks performed due diligence and reviewed all of MFB's contracts and obligations with other retailers. (*Id.* at 5.) Starbucks was also permitted to review MFB's books and records at all times. (*Id.*)

The general course of the parties' conduct and the Blanket Purchase Agreement ("BPA") process has been detailed in past orders. Plaintiffs allege that although each BPA contained language disclaiming a legal obligation arising from a contract, MFB acted in reliance on the amount of products sought by Starbucks in volume projections and the amount of prepared products requested through verbal agreements, "usually confirmed by the BPA[]s." (*Id.* at 6.) Plaintiffs allege that in reliance on the relationship with Starbucks, MFB upgraded its machinery, hired new staff, and increased orders for raw products and packaging. (*Id.* at 7.) MFB received its first BPA from Starbucks on or about December 5, 2007, and delivered its first shipment to Starbucks in March 2008 "pursuant to the terms outlined in Starbucks['] volume projections, BPAs, and BPA Releases." (*Id.* at 8.)

In March 2008, Starbucks provided volume projections to MFB forecasting sales for product orders through September 2008. (*Id.*) In September 2008, Starbucks provided additional volume projection for the months of January through March 2009. (*Id.*) Also that month, Starbucks informed MFB that it had received complaints about the quality of MFB's products. (*Id.* at 9.) Upon investigation, MFB discovered the reason for the defect and Starbucks was reimbursed for the costs related to the product withdrawal. (*Id.*) In June 2009, Starbucks received further complaints regarding some MFB products and initiated a product withdrawal. (*Id.*) Starbucks representatives then toured MFB facilities and discussions led to an agreement to work with Starbucks representatives to ensure product quality. (*Id.*) In

---

[1] The facts herein are derived from the Third Amended Complaint ("TAC").

September 2009, Starbucks Product Manager Lori Harris informed MFB that the business was being put out to bid. (*Id.* at 10.) MFB reprocessed the bid forms and was awarded business in November 2009. (*Id.*) In awarding MFB the business, Starbucks and Harris imposed certain conditions through an "Action Plan" which included further product specifications, increased quality reporting, additional investment in equipment for internal testing, and upgraded machinery for product packaging. (*Id.*) Plaintiffs allege that MFB complied with the conditions imposed at significant costs. (*Id.*)

In January 2010, MFB informed Starbucks representatives Jane Wong ("Wong") and Destiny Linayao ("Linayao") that it was having difficulty maintaining current price levels due to a rise in commodity prices. (*Id.*) Wong and Linayao instructed MFB to forward an updated pricing analysis. (*Id.*) Plaintiffs allege that Starbucks then began a business relationship with Sahale Snacks and disclosed MFB's confidential pricing information in an effort to surreptitiously remove MFB from future business with Starbucks. (*Id.*)

In early March 2010, Wong informed MFB that the BPAs were pending, but would not be released until MFB agreed to a price decrease. (*Id.* at 11.) Later that month, Wong provided MFB with a volume estimate and "made MFB an offer: that Starbucks would provide purchase orders through October of 2010 exceeding $3.1 million in product if MFB would provide a price decrease for product orders." (*Id.*) Plaintiffs allege that MFB accepted and decreased the unit price, and that this offer (identified by Plaintiffs as the "$3.1 Million Contract") was approved and ratified by Julie Felss Masino ("Felss Masino") and her superiors with authority to bind Starbucks. (*Id.*) On April 2, 2010, after entering into the verbal $3.1 Million Contract, Starbucks issued a BPA for $1,839,656.46 for the months of June through August 2010. (*Id.*) Days later, Wong notified MFB that Starbucks had "released" the April 2, 2010, BPA, which Plaintiffs allege constitutes partial performance on the $3.1 Million Contract. (*Id.* at 12.) Plaintiffs allege that in reliance on this release, MFB entered into a contract to purchase approximately $1,000,000 in cashews to fulfill the orders and that Starbucks, including Wong and Felss Masino, knew MFB would do so. (*Id.*)

1    In March 2010, Starbucks informed MFB that it had received complaints regarding
2 MFB's cashew products and later conducted a conference call with the Food and Drug
3 Administration ("FDA"). (*Id.*) MFB was denied participation in the call and did not receive
4 information regarding what occurred. (*Id.* at 12-13.) Later in April 2010, Wong informed
5 MFB that MFB products were "consistently rising and doing well," but soon thereafter
6 notified MFB of a second complaint. (*Id.* at 13.) Starbucks did not provide details to MFB.
7 (*Id.*) MFB forwarded the results of its internal testing to Starbucks to demonstrate that all
8 retained products met the requirements of the Action Plan. (*Id.*)

9    On May 14, 2010, MFB received a termination letter from Starbucks indicating that
10 no new orders would be issued due to product quality concerns, but soon thereafter
11 Starbucks informed MFB that it refused to honor both past and current BPA Releases. (*Id.*
12 at 14.) Plaintiffs allege representative Linayao informed MFB that Starbucks would
13 reimburse the cost of film and packaging, but that Starbucks never did so, leaving MFB with
14 more than $37,000 of unusable Starbucks materials. (*Id.*) Later in May 2010, MFB received
15 an investment and merger proposal from R.C. Frontis Partners, which was withdrawn after
16 the firm learned of MFB's financial hardship allegedly resulting from Starbucks' conduct.
17 (*Id.*)

18    On May 25, 2010, an independent laboratory testing of retained samples found all
19 samples to be within the acceptable range of quality specification as provided by the Action
20 Plan. (*Id.*) Despite having just terminated the business relationship, Starbucks informed MFB
21 that it would still accept all almonds for open purchase orders. (*Id.*) Plaintiffs allege that
22 MFB shipped the almonds at Starbucks' request. (*Id.*) Plaintiffs further allege that on June
23 1, 2010, Starbucks informed MFB that all outstanding payments to MFB were on hold,
24 including that for the open almond orders that Starbucks had just requested. (*Id.* at 15.)

25    On June 4, 2010, Starbucks informed MFB that it intended to withdraw MFB products
26 due to FDA concerns. (*Id.* at 16.) MFB sought a return of their products to mitigate damages,
27 but only under the condition that such return was not considered an admission of liability.
28 (*Id.*) Starbucks returned the products. (*Id.*) Plaintiffs allege that the FDA investigation

revealed that a gas leak at a Starbucks facility had tainted certain MFB products, through no fault of MFB. (*Id.*)

Plaintiffs claim that Starbucks' product withdrawal and alleged failure to fulfil the outstanding product orders and $3.1 Million Contract caused MFB extreme financial difficulty and forced it into insolvency. (*Id.*)

Since the filing of this action, the Court has issued orders addressing motions to dismiss the initial complaint (Doc. No. 12), the First Amended Complaint (Doc. No. 19), and the Second Amended Complaint (Doc. No. 26). Three claims remain: (1) breach of contract; (2) negligent misrepresentation; and (3) intentional misrepresentation. (*See* Order 12-13, Doc. No. 19.) Plaintiffs also previously included a claim to punitive damages. The Court determined that Plaintiffs failed to adequately plead such damages, noting that the Second Amended Complaint "fail[ed] to allege sufficient facts to establish corporate liability for punitive damages resulting from its employees' acts." (Order 11, Doc. No. 26.)

## II. MOTION TO DISMISS UNDER RULE 12(b)(6)

The Court is now faced with Defendant's motion to dismiss the Third Amended Complaint. In moving to dismiss, Defendant focuses on Plaintiffs' request for punitive damages. *See Whittlestone, Inc. v. Handicraft Co.*, 618 F.3d 970, 974-75 (9th Cir. 2010) (discussing Rule 12(b)(6) motions to dismiss damages).

### A. Legal Standards

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims asserted in the complaint. Fed. R. Civ. P. 12(b)(6); *Navarro v. Block*, 250 F.3d 729, 731 (9th Cir. 2001). In ruling on a motion to dismiss, the court must "accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party." *Vasquez v. L.A. Cnty.*, 487 F.3d 1246, 1249 (9th Cir. 2007). However, courts are not "bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009).

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility does not equate to probability, but it requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Dismissal of claims that fail to meet this standard should be with leave to amend unless it is clear that amendment could not possibly cure the complaint's deficiencies. *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998). In determining whether to permit the opportunity to amend a complaint, the Court considers the delay caused by repeated amended complaints, prejudice to defendants, futility, and bad faith. *See Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994); *DCD Programs v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987).

In addition to actual damages, California law authorizes exemplary damages "in an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294. A corporate entity, however, cannot be liable for punitive damages resulting from its employees' acts unless an officer, director, or managing agent of the corporation: (i) had advance knowledge of the unfitness of the employee and nevertheless employed him with a conscious disregard of the rights or safety of others; (ii) authorized or ratified the conduct giving rise to punitive damages; or (iii) was personally guilty of such conduct. Cal Civ. Code § 3294(b). With respect to ratification, to justify punitive damages against a corporation, a plaintiff must show that an officer, director, or managing agent had actual knowledge of the alleged malicious conduct. *College Hosp., Inc. v. Sup. Ct.*, 8 Cal. 4th 704, 726 (1994) ("Corporate ratification in the punitive damages context requires actual knowledge of the conduct and its outrageous nature.").

Officers, directors, and managing agents are the group within a corporation "whose intentions guide corporate conduct." *Cruz v. HomeBase*, 83 Cal. App. 4th 160, 167 (2000). Officers—presidents, vice presidents, treasurers, and corporate secretaries—and members

of a board of directors are readily identifiable. Managing agents are employees who enjoy "substantial discretionary authority over decisions that ultimately determine *corporate policy*." *Id.* at 167 (quoting *White v. Ultramar*, 21 Cal. 4th 563, 573 (1999) (internal quotation marks omitted)). That an employee ranks high in the corporate hierarchy, however, does not itself establish the employee as a managing agent. *Kelly-Zurian v. Wohl Shoe Co.*, 22 Cal. App. 4th 397, 421-22 (1994).

**B.     Discussion**

To evaluate the present motion, the Court has painstakingly compared the Second Amended Complaint with the TAC. The Court acknowledges that Plaintiffs included numerous sentences in which they allege that certain actions were carried out or ratified by managers, directors, or managing agents, or others with corporate authority to bind Defendant, and appear to focus throughout on Felss Masino. Even so, Defendant asserts that the additions are legal conclusions and without factual support. The Court agrees.

Although the names and titles of certain personnel are sprinkled throughout the TAC, the TAC is still wanting in regard to factual allegations supporting a punitive damages prayer. The federal pleading standard is not onerous, and the Rule 12(b)(6) context is generous to the non-movant. *See Vasquez*, 487 F.3d at 1249. Even with this, Plaintiffs have been unable to present the Court with pleadings sufficient to support such a damages request. The Court reminds Plaintiffs that punitive damages are not warranted in every case and are not awarded as a matter of course whenever a party's conduct is deemed unlawful. Moreover, as the Court has noted previously, legal conclusions and employing the "magic words" will not save an otherwise faulty pleading. (*See* Order 22, Doc. No. 22); *see also Perkins v. Superior Court*, 117 Cal. App.3d 1, 6-7 (1981) (noting that pleading the language of section 3294 "is not objectionable when sufficient facts are alleged to support the allegation"); *Cyrus v. Haveson*, 65 Cal. App. 3d 306, 316-17 (1976) ("To support punitive damages, the complaint . . . must allege ultimate facts of the defendant's oppression, fraud, or malice.").

Because it is apparent to the Court that Plaintiffs do not have the factual support to support a claim to punitive damages at this point, the present motion is denied without leave to amend. The Court, however, is mindful that facts arise during the course of discovery. Should facts develop that would provide Plaintiffs with the ability to plead a factual basis for punitive damages, Plaintiffs may move to add a request for punitive damages at the appropriate time, and no later than thirty days (30) after the discovery cutoff deadline. Until then, this case has already undergone several motions to dismiss and it is time for the litigation to progress.

## III. CONCLUSION

For the reasons stated above, the Court GRANTS Defendant's motion to dismiss as to punitive damages without leave to amend at this point in the litigation. Plaintiffs may move for punitive damages should facts develop over the course of discovery that would allow them to plead to the extent required by relevant law.

IT IS SO ORDERED.

DATED: October 10, 2014

_____
Hon. Anthony J. Battaglia
U.S. District Judge